- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EMERALD ORGANIC PRODUCTS, INC. and  :
IAN PARKER,                          :
                                     :     No. _____
               Plaintiffs,        :
                                     :
       -against-           :
                                     :
JOSEPH G. MAYO,                      :
                                     :
               Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Emerald Organic Products, Inc. ("EMOR") and Ian Parker ("Parker"), for their Complaint against defendant Joseph G. Mayo ("Mayo" or "Defendant"), allege as follows:

### I.

### NATURE OF THE ACTION

1.    This action arises out of the retaliatory conduct of defendant Joseph Mayo, the former Chief Executive Officer of EMOR who was terminated from the company in February 2020 based on Mayo's interference with and objections to EMOR's operations and growth strategy, and overall inability to interact with EMOR's leadership in a professional and business-like manner.

2.    During his relatively his short tenure with EMOR, Mayo continually harangued plaintiff Ian Parker, EMOR's Chief Executive Officer and Chairman of its Board of Directors, and other senior executives at the company, for additional compensation as well millions of shares EMOR stock – neither of which he was entitled to. Moreover, despite having no ownership interest in EMOR and his responsibilities were confined to that of a CFO, Mayo demanded that he be involved in the decision-making process concerning every aspect of the

company, including operations, marketing, public relations and other areas outside of his duties and responsibilities. As Mayo stated, he was "tired of being told what's going to happen . . . and how the business will be run."

3.    When Ian Parker refused to yield to Mayo's demands for more money and power within the company, Mayo became a typical disgruntled employee – a cancer within the organization who, at every opportunity, whispered disparaging comments about Parker in the ear of EMOR's other senior executives and otherwise sowed seeds of discontent within the organization.   In addition, Mayo began unilaterally taking actions, without any authority from EMOR, that were detrimental to the company, including terminating the company's public relations firms.  Mayo also helped himself to funds directly from EMOR's bank accounts, which he used for personal purposes unrelated to the company's operations.

4.    EMOR terminated Mayo on or about February 6, 2020, only nine (9) months into his tenure.  Upon his termination, Mayo engaged in yet another ill-conceived plan – this time to extort money from EMOR and Parker.  When Parker did not yield to Mayo's demands for money and stock, Mayo – under the guise of a shareholder watchdog group he claims to have formed called otcscammer.com – set out on a campaign to destroy Parker's personal and professional reputation by contacting EMOR's shareholders, attorneys and other individuals and spreading defamatory lies about Parker and EMOR.

## II.

## THE PARTIES

5.    Plaintiff EMOR is a Nevada corporation with its principal place of business located at 331 Dante Court, Suite E, Holbrook, New York 11741. EMOR is a high growth, diversified health science and technology company focused on the development, manufacture,

and distribution of consumer health and wellness products, including certain proprietary cannabidiol products.

6.     Plaintiff Ian Parker is an individual who resides at 92 Sharon Lane, Greenlawn, New York 11740. Mr. Parker is the Chief Executive Officer of EMOR.

7.     Defendant Joseph G. Mayo is an individual and citizen of the State of Florida residing at 1425 SR 16 Lot 37, St. Augustine, Florida 32084. Mayo was the Chief Financial Officer of EMOR from May, 2019 until his termination in February, 2020.

**III.**

**JURISDICTION AND VENUE**

8.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2) and (3).

**IV.**

**FACTS AND CIRCUMSTANCES GIVING RISE TO THE CLAIMS ALLEGED**

**A.     The Business of EMOR**

10.     EMOR was initially formed in 1977 under the name Permco LTD. The company underwent several name changes throughout its history, and was renamed Emerald Organic Products, Inc. – its current name – on August 3, 2012. The company was, at times, highly diversified; it engaged in the retail sale of organic meat products, held minority interests in oil and gas property leases and owned production and marketing rights to a patented pet waste disposal product. By the first quarter of 2019, however, EMOR's only existing business was investing and holding minority interests in petroleum producing leases in Texas.

11.     In April 2019, EMOR consummated a reverse merger with Pura Vida Health, LLC ("Pura Vida"), a company formed the prior year that was engaged in the development

manufacture and distribution of health and wellness supplements, sports nutrition, functional foods and cosmetic products. Pursuant to the merger, EMOR acquired 100% of the membership interests in Pura Vida in exchange for approximately 90% of EMOR's common stock. As a result, Pura Vida became a wholly-owned subsidiary of EMOR, the previous business of EMOR was ceased, and the existing operations of Pura Vida continued as the business of EMOR.

12. Today, EMOR is engaged in one line of business: the development, manufacture, and distribution of consumer health and wellness products. Through its Pura Vida brand, the company has developed and commercialized a line of vitamins and supplements with certain proprietary cannabidiol ("CBD") health and wellness products which are marketed nationally and in certain foreign countries through various marketing and sales distribution channels. The company's CBD products include CBD vitamins, chewable gummies, liquids, drinks, tinctures and cosmetics. In 2019, EMOR established Emerald Organic Life Sciences, LLC to develop biopharmaceutical assets licensed from Amarantus Bioscience Holdings, Inc. EMOR recently formed a joint venture with Todos Medical USA, Inc. for the purpose of distributing certain novel coronavirus (COVID-19) test kits.

**B.     Enter Joseph Mayo:  A Disruptive Force Within the Ranks**

13. Upon consummation of its merger with Pure Vida in April 2018, EMOR's pre-merger management resigned their executive positions and were replaced by Pura Vida's existing management as follows: Ian Parker (Chief Executive Office and Chairman of the Board of Directors); Matthew Dill (President and Treasurer (now Chief Operating Officer)); M. Ali Husain (Chief Information Officer); and John Lee (Secretary).

14. Mayo joined EMOR in May 2019 as its Chief Financial Officer. Mayo is an accountant who had previously performed accounting services for one or more of Ian Parker's

other companies. Mayo was provided no ownership interest or voting rights in EMOR, and was given no decision-making authority outside of his duties and responsibilities as CFO.

15.    Notwithstanding the limitations on Mayo's authority, from the inception of his tenure at EMOR, Mayo exhibited a heightened and unrealistic sense of his value and contributions to the success of the company, intruded on matters outside of his bailiwick, such as operations, marketing, and public relations, and tried to undermine his colleagues with whom he felt threatened by their abilities and successes. Rather than work in a cooperative spirit towards the success of the company, Mayo was the antithesis of a team player who sowed seeds of discontent throughout the company, and even tried to drive a wedge between Ian Parker and his long-time friend and colleague, Matthew Dill, EMOR's Chief Operating Officer and President.

### 1.  **Mayo Impedes on EMOR's Growth Strategy**

16.    An integral part of EMOR's business plan was to grow through acquisitions. In July 2019, in furtherance of its growth by acquisition strategy, EMOR hired Michael Berg, an individual with expertise in mergers and acquisitions and licensing transactions. Since the merger in April 2019, EMOR has acquired, or entered into agreements to acquire, several different companies, license their technology or enter into joint ventures:

- On or about July 8, 2019, Emerald Organic announced that it had entered into a strategic partnership with Sport & Wellness Holdings, LTD to accelerate its distribution and expand the market territory for its Pura Vida cannabidiol products.

- On the heels of that transaction, Emerald Organic announced on or about August 5, 2019 that it had entered into an exclusive licensing agreement with PetVivo Holdings, Inc. for the use of OraPatch™, a patented oral delivery method for various substances, including cannabidiol.

- On or about October 24, 2019, Emerald Organic announced that it had entered into a binding term sheet with Amarantus Bioscience Holdings, Inc. ("AMBS"), for an exclusive worldwide license to development and

commercial rights to AMBS's neurologic, regenerative medicine and ophthalmic therapies and diagnostics;

- On or about November 11, 2019, Emerald Organic announced that it had signed an agreement to acquire a controlling interest in a vending machine manufacturing and distributing company, for the purpose of, among other things, offering its CBD products through vending machines.

- More recently, Emerald Organic announced on March 27, 2020 that it had entered into a merger agreement with Bonsa Health, a digital pharmacy capable of same day delivery of Rx medications anywhere in the United States. Under the terms of the acquisition, Emerald Organic will take a 51% controlling stake in Bonsa Health.

- And on March 31, 2020, Emerald Organic announced that it had entered into a definitive agreement acquire Carie Health Inc., a telehealth and virtual care technology and service solutions company. As the company announced: "Alongside Emerald's recent acquisition of Bonsa Health, a leading digital pharmacy with same day delivery of Rx medications anywhere in the US, the acquisition of Carie Health creates an integrated healthcare technology company. This unique service combination will meet the growing demand to deliver high-quality healthcare in a virtual setting."

17. Mayo was threatened by Berg's role at EMOR and his contributions to the company's growth. Indeed, because Mayo knew that Berg's hiring would complicate his plans to insinuate himself into a decision-making role with respect to all aspects of EMOR's business, Mayo opposed Berg's hiring in the first instance. After Berg was hired, Mayo not only refused to cooperate with him, but made it his mission to push Berg out of the company. On a regular basis, Mayo badmouthed Berg to Ian Parker, EMOR's board of directors, and even to the company's outside auditors, and lobbied to have him terminated.

18. By September 2019, Mayo's singular focus on his own advancement and lack of any desire to work cooperatively with his colleagues was so pervasive and disruptive that Parker gave Mayo an ultimatum: either become a team player or look for another job. Unfortunately, Parker's admonition to Mayo did not have the desired effect. To the contrary, Parker became an

additional target of Mayo's discontent.  In his continuing effort to crack EMOR's inner circle and

obtain decision-making authority over the direction of the company, Mayo falsely represented to

anyone who would listen – both within and without the company – that Parker was a narcissist, a

sneaky and deceitful person, and a relentless liar who could not be trusted.

19.     On one occasion, EMOR was negotiating a licensing transaction with Amarantus

Bioscience Holdings, Inc. ("AMBS") for an exclusive worldwide license to development and

commercial rights to AMBS's neurologic, regenerative medicine and ophthalmic therapies and

diagnostics.  Pursuant to the proposed transaction, AMBS was to receive, in addition to royalties,

EMOR Preferred Stock.  Mayo was against the proposed transaction generally, and disagreed

with value, specifically.

20.     In response to his disagreement over the valuation, Mayo escalated his attacks on

Parker and Michael Berg, and even tried to tank the AMBS transaction by telling Matthew Dill

that Parker and Berg did not properly conduct due diligence on the deal. Specifically, in

reference to Parker and Berg heading up the AMBS deal, Mayo texted Dill: "We cannot have the

inmates running the asylum."

### 2.   Mayo Foists His Cousin Upon EMOR In His Ongoing Efforts to Gain Additional Power Within the Company

21.     Instead of devoting his time an attention to his own duties and responsibilities as

CFO, Mayo directed his efforts towards getting his cousin, David Hodge ("Hodge"), a position

on EMOR's medical board in order to sway the votes of the Board of Directors in connection

with his disagreements with Parker about the direction of the company.

22.     As a direct result of Mayo's disapproval of the AMBS transaction, Mayo sent an

email to Parker and Berg in response to the term sheet that AMBS provided that stated: "I will

request of the Board that Dr. Hodge and the to be appointed medical board, specifically Dave, be

copied on any and all technical and scientific correspondence from this point forward." Prior to this demand, Mayo had been surreptitiously setting up meetings between Hodge and another member of the board, Ali Hussain, for Hodge to discredit and, hopefully, convince the board of directors to abandon, the AMBS deal.

23.     In or around November 2019, the Federal Drug Administration ("FDA") started banning certain vaping devices as part of its efforts to crack down on their harmful side effects and to correct the popular but misguided belief that they are a safer alternative to cigarettes. In response to the FDA ban, EMOR believed that it was important for the company to issue a press release to express its position against vaping.

24.     Mayo saw this as yet another opportunity to advance his cousin, Hodges, in the mix of corporate decisions. Mayo, without any authority to do so, emailed Mercury LLC ("Mercury"), EMOR's public relation firm, and stated: "I do not want the Vape press release launching without a comment from our medical board head, Dr. Hodge – this is a perfect opportunity to reinforce Ian and the company's message with expert commentary from the scientific community." In yet another example of intruding into areas over which he has no authority, Mayo then unilaterally terminated EMOR's business relationship with Mercury.

## C. Mayo Adds Theft of Corporate Funds to His Wrongful Acts

25.     Almost from the beginning of his tenure with EMOR, Mayo continually lobbied for a higher compensation as well as shares of EMOR stock. EMOR, however, who believed that Mayo greatly overstated his importance and contributions to the company, did not commit to giving Mayo either.

26.     Taking matters into his own hands, Mayo convinced EMOR to give him unilateral access to the company's bank accounts. Having gotten access to EMOR's bank accounts, Mayo

then blocked Parker's access to those accounts. When Parker reviewed the bank statements, he saw that Mayo had been withdrawing company funds from ATM's and not using those funds for company use. Between August 1, 2019 and January 30, 2020, Mayo made unauthorized withdrawals from EMOR's bank account at Bank of America totaling approximately $50,000.

27.     On another occasion in September 2019, Mayo purported to bring two investors to EMOR, who purported to invest $10,000 each in the company. No documentation exists to support the alleged investments. Nevertheless, on the very same day the $20,000 "investment" was deposited into EMOR's bank account, Mayo, without authority, personally withdrew $17,000 from the same account.

28.     In or about February, 2019, Mayo closed one of EMOR's bank accounts. Without any authority, Mayo emptied the funds that were in the account and misappropriated them for his own personal use.

29.     On yet another occasion, Mayo, who was living in Florida, had EMOR send him plane fare in connection with an upcoming meeting in New York with the company's Board of Directors. Mayo, however, never attended the meeting and never returned the airfare the company advanced to him.

**D.      Asleep at the Switch:  Mayo Causes Emerald Organic to
be Saddled With a "Stop Sign" on www.OTCmarkets.com**

30.     EMOR is a public company whose stock is not traded on a listed exchange. Rather, its stock trades on the over the counter market under the symbol EMOR. In the past, unlisted stocks were quoted on the so-called "Pink Sheets." The daily bid-ask paper quotes were eventually replaced, giving broker-dealers the capability to electronically trade and quote prices, so the term Pink Sheets no longer appropriately described the quotation system. A name change

occurred in 2008 from Pink Sheets to Pink OTC Markets, and again in 2011 to the current name of OTC Markets Group.

31.     Companies quoted on www.otcmarkets.com, like EMOR, fall into one of three categories, based on the amount of financial information and other disclosures they elect to make public.   These categories are identified on www.otcmarkets.com as "current information," "limited information" or "no information."

32.     At that time of EMOR's merger with Pura Vida and when Mayo joined the company the following month, EMOR was, and desired to remain, classified as a "current information" company.   In order to maintain that designation, EMOR was required to timely file: (1) the information required by the OTC Pink Basic Disclosure Guidelines; (2) for each fiscal quarter, GAAP prepared quarterly financial statements, consisting of a balance sheet, income statement, statement of cash flows and Notes to the financial statements); and (3) an Annual Report, containing GAAP prepared annual financial statements.

33.     As EMOR's CFO, Mayo was responsible for, among other things, overseeing the preparation of the company's financial statements and making the filings required to maintain the company's status as a Tier 1 OTC Pink sheet company – *i.e.*, a company with a designation of "current information."

34.     Mayo, as it turns out, failed to do his job.   Rather than preparing and filing the required financial statements and related disclosures himself, or even overseeing such preparation and filing, Mayo allowed EMOR's pre-merger attorney/accountant to prepare the filings.   Unfortunately, the financial statements failed to comply with GAAP in several respects. As a result, EMOR was downgraded to the "no information" category, and flagged with a "stop

sign" on www.otcmarkets.com, the highest warning to potential investors that the company should be treated with suspicion, and to avoid making investments in the company.

35.     The downgrade could not have come at a worse time as EMOR was then trying to obtain bridge financing.  EMOR was saddled with the stop sign designation for months, and was forced to spend substantial sums in attorneys' and other fees to make the financial statements GAAP complaint and have the stop sign designation removed.

**E.   Mayo Continues to Be Unable to Perform the Role of a CFO**

36.     Upon joining EMOR in May 2019, one of Mayo's most important tasks was getting the company prepared for the audit of its year-end financial statements.  Mayo, however, again dropped the ball, as he had done when he caused the company to be saddled with the stop sign designation.  Again, Mayo failed to take responsibility and, instead, retained a local Florida firm to prepare the company's financial statements and otherwise get the company's books and records in order.

37.     Unfortunately, the resulting financial statements were utterly useless and could not be presented to the auditors in connection with the year-end audit.  Ian Parker offered to work with Mayo to get the company's records in order, but Mayo declined the help, insisting he would get it done shortly.  Mayo, however, did not "get it done shortly."  While claiming over and over that he just needed "two weeks," he still had not produced a useable set of financial statements by late August 2019.  In fact, by August 2019, Mayo was largely an absentee employee who rarely went to EMOR's offices.

**F.     Mayo Continues to Defame Parker**

38.     From Thanksgiving 2019 through January 2020, Mayo rarely returned to EMOR's offices.  Mayo's physical absence from EMOR, however, did not prevent him from continuing

his efforts to elevate himself within the company by being a divisive figure in the company and disparagement of Ian Parker to third parties. For example:

a) On December 1, 2019, in the midst of an audit of EMOR conducted by Baker Tilly LLP ("Baker Tilly"), EMORs outside auditors, Mayo sent Parker an email, with copies to Matt Dill, Michael Berg, John Lee and Robert Helsik that stated: "You have lied and misrepresented material facts to your colleagues, consultants, and investors. This includes diverting corporate funds for your personal benefit, and, worse, concealing the payments with false descriptions checks, etc."

b) By email to Parker sent on December 9, 2019, with copies to Matt Dill and John Lee, Mayo stated: "What you and Mike had handed me (indirectly may I add) is laughable in terms of due diligence. I've witnessed deli's that were better managed."

c) On January 4, 2020, in connection with Baker Tilly's preparation of EMOR's public disclosures, Mayo misrepresented to Baker Tilly that EMOR's Board of Directors had replaced Parker with Matthew Dill. That representation was false. Parker had been the CEO of EMOR since July 7, 2019 and is listed as CEO on EMOR's publicly filed disclosure statements.

## G. **Mayo Gets His Personal Assistant to Threaten Parker and EMOR**

39.     In October 2019, Mayo hired Elizabeth Kelly ("Kelly") as his assistant, but EMOR terminated her because she was not competent. Two weeks later, however, Mayo re-hired Kelly, ostensibly as his personal assistant and at his personal expense.

40.     On or about January 18, 2020, Kelly reached out to Matthew Dill and Parker for purported outstanding wages regarding work she performed for Mayo. Parker reiterated that her compensation was Mayo's responsibility because EMOR had previously terminated her, but even so, Parker attempted to mitigate the situation amicably and told her: "I would like to speak with you regarding the above to understand the facts from your side, come to an understanding of both an amount and timing and square this up. Let's have the conversation next week." Kelly, however, was uncooperative. She not only continued to demanded payment, but also threatened to expose Parker and EMOR with information that Joe Mayo and his brother provided her:

> [J]oe provided me and Dan Mayo with a lot of information about
> the company and you personally related to the business. There
> were also other things that transpired with Joe. I'd rather not put
> these in writing nor do I think you would want that.

41.     In a follow up threatening email to Parker, Kelly said: "I'm calling Newsday, Fox News, the stockholders and others. I'll let you be surprised as to who the others are."

## H. The Beginning of the End: Mayo's Use of His Alleged "Watchdog" Organization as a Tool to Extort Money and Stock from EMOR

42.     EMOR terminated Mayo on or about February 6, 2020. Upon his termination, Mayo went on an extortionate and defamatory rampage. For example, in a text Mayo sent to Matthew Dill on February 6, 2020, Mayo said:

> You disappoint me Matt. No deal. Tomorrow I will call Baker
> Tilly . . . What comes after that is a storm. I will get my 5M
> shares and I will personally make EMOR a project. The Company
> has acted in bad faith. I suggest you call me tonight. I am the
> wrong guy to shaft.

43.     After Mayo was terminated, he and Matthew Dill attempted to negotiate a separation agreement. The parties never concluded an agreement, however, because Mayo's demands were entirely unreasonable, including a demand for 5 million shares of EMOR stock.

44.     In his continued quest to obtain what he wanted, Mayo threatened to report EMOR and Parker to criminal and regulatory authorities. In one email he sent to Matthew Dill on May 9, 2020, with a copy to a CPA firm he had retained, Mayo stated:

> Matt
>
> I now know you've been less than transparent with me and it's time
> to belly-up.
>
> Deen Wall tells me you made another commitment weeks ago to
> reimburse him for the 10k he paid and got nothing for. For the
> second time, you mentioned a lawyer and release; you know there
> is no lawyer and there is no release.

I have a suggestion that achieves a settlement to the "global" issues. In my opinion, the only reason you have not felt the heat is because the authorities are preoccupied with the pandemic. That is due to change shortly based on information that has come my way. Parker's every move is being monitored by FINRA and other agencies and when the next round of financials are issued the process will ramp up. For example, do you really think the AMBS, Carie Health, Vending idiots, and the latest Tampa pharmacy scams are going to pan out. Parker is in it for a money grab and you know it and this email places you, again, in a position of knowledge. I know of several IMT shareholders who are ready to forget their money and simply have him charged.

I want to help you get past this, but you have to cooperate. I suggest we have an initial discussion to follow up with a face to face when I'm on LI soon.

Matt, this is not a game. You're screwing with people's lives and should have moved on Parker already. I am aware of your shareholder call and have full transcript of the contents: what is this about you being a consultant?

Call me: if not, I'm afraid you are going to become a project. Otherwise on other fronts, I (sic) your family is healthy and pray we can resolve your issues.

Jmn

45. On May 19, 2020, Mayo threatened EMOR and Parker by sending their SEC attorneys the following email:

Keith

Just a short note since you haven't gotten back to me. We're launching our OTC Research venture as the first watchdog group dedicated to alerting investors to Pink Sheet companies with questionable reporting metrics and information.

I won't hide the fact that EMOR is my Guinea pig (no pun intended as far as the pig reference is concerned). We've had a strong response from our contacts at various regulatory agencies and our services have attracted broad interest.

We plan to go public with a special report on EMOR scheduled for June. We've solicited responses input from AMBS and will reach out to other EMOR affiliates.

I want give EMOR ample time to respond to the report which I will share with you prior to publication which will go nationwide via multiple news.

As long as you remain SEC counsel, I'll provide the draft report when ready. To clarify, our news releases serve to heighten awareness where information just doesn't "jive". In EMORS case, "jive" appears to be an understatement. Also, our news releases are sent to every broker dealer registered with FINRA; we plan to be known as the "carfax" for Pink Sheet issuers.

Jm

46.    Mayo's so called "watchdog group" is nothing more than a vehicle to advance his vindictive scheme in defaming Parker to business partners, colleagues and shareholders.

47.    Mayo continued to use his so-called watchdog group in pursuit of his campaign against EMOR and Parker.   On May 21, 2020, using the username "otcscammer," Mayo contacted Gerald Commissiong, the CEO of AMBS, to solicit information from him about EMOR and Parker.  After being told repeatedly by Mr. Commissiong to cease all communication with him, Mayo again contacted him using the username "pinksheetresearch." Mayo attempted to apply pressure on Mr. Commissiong by stating in relevant part: "Your emails are all part of our file . . . we're nearing 12 days with no disclosure. When are you going to issue disclosure?"

48.    Mayo next took his defamatory campaign directly to EMOR's stockholders.  On or about July 3, 2020, Mayo contacted some of EMOR's shareholders and told each of them bald faced lies about Parker in order to get them to join a class action lawsuit he said he was going to commence.

49.    Mayo first called shareholder Randy Swinkle and told him that "there are big problems at" EMOR, and that Mayo needed to leave the company because "it was a fake, shell, company."  Mayo also misrepresented to Swinkle that he has "proof that Parker stole

$1,000,000" from a former entity with which Swinkle was a shareholder, and that Parker "transferred those funds into his wife's bank account." Mayo further told Swinkle that Parker is a "scam artist" who was "involved with bad people," that "everything about EMOR is fraudulent," and that "Parker's own mother is suing him for $6,000,000."

50.    After he called Swinkle, Mayo called Carol Robinson ("Robinson"), another stockholder of EMOR, and repeated the defamatory statements he made to Swindle, and tried to persuade her to join his class cation lawsuit.

51.    Mayo next called Anthony Spagnolo with the specific intent of defaming Parker and EMOR.  Mayo falsely represented to Spagnolo that EMOR's headquarters was "closed, empty and that nobody is working there."  Mayo also attempted to persuade Spagnolo to join his class action lawsuit by repeating the same defamatory statements he made to Swinkle and Robinson – *i.e.*, that he has evidence that Parker stole $1,000,000, and that Parker transferred the stolen funds into his wife's account.

## V.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Defamation and Defamation Per Se)

52.    Plaintiffs repeat and reallege the allegations made in Paragraphs 1 through 51 hereof as though fully set forth herein.

53.    Mayo published false and defamatory statements to third parties, in writing and orally, concerning Ian Parker and EMOR over an extended period of time.  Several of Mayo's statements charged Mayo and/or EMOR with serious crimes and/or tended to injure them in their trade, business, or profession.

54.   Mayo's defamatory statements include the following:

a.   "there are big problems at" EMOR, and that Mayo needed to leave the company because "it was a fake, shell, company;"

b.   "Parker stole $1,000,000" and "transferred those funds into his wife's bank account;"

c.   Parker is a "scam artist" who was "involved with bad people;"

d.   "everything about EMOR is fraudulent;"

e.   "Parker's own mother is suing him for $6,000,000;"

f.   Parker "lied and misrepresented material facts to your colleagues, consultants, and investors. This includes diverting corporate funds for your personal benefit, and, worse, concealing the payments with false descriptions checks, etc;"

g.   "We're launching our OTC Research venture as the first watchdog group dedicated to alerting investors to Pink Sheet companies with questionable reporting metrics and information. I won't hide the fact that EMOR is my Guinea pig (no pun intended as far as the pig reference is concerned). . . . To clarify, our news releases serve to heighten awareness where information just doesn't "jive". In EMORS case, "jive" appears to be an understatement;"

h.   "Parker's every move is being monitored by FINRA and other agencies and when the next round of financials are issued the process will ramp up;"

i.   "[D]o you really think the AMBS, Carie Health, Vending idiots, and the latest Tampa pharmacy scams are going to pan out. Parker is in it for a money grab and you know it . . . I know of several IMT shareholders who are ready to forget their money and simply have him charged."

55.   The defamatory statements described herein are false statements of fact constituting, all of which are defamatory (and some of which are defamatory per se) and are not protected by any privilege. Mayo's defamatory statements were made with malice and/or gross negligence for the truth and/or falsity, and were made with malice and/or gross negligence for the personal reputation and business interests of Plaintiffs.

56.     As a direct and proximate consequence of Mayo's intentional, unlawful, and malicious acts, Plaintiffs have suffered, and continue to suffer, monetary and non-monetary damages, including but not limited, mental and physical pain and suffering, emotional distress, harm to their personal and professional reputations, lasting embarrassment, humiliation, anguish, contempt, ridicule, damage to Plaintiffs' good name and reputation, and the loss of income, future income, and other direct and indirect costs. Plaintiffs have been injured, and continue to be injured, in an amount to be determined at trial, but in no event, less than Ten Million Dollars ($10,000,000).

57.     In making the defamatory statements as set forth herein, Mayo acted with actual malice and, therefore, is responsible for punitive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Injurious Falsehood)

58.     Plaintiffs repeat and reallege the allegations made in Paragraphs 1 through 57 hereof as though fully set forth herein.

59.     Mayo intentionally and maliciously published the above-referenced defamatory statements to third-parties, all of which contained false allegations of wrongful, criminal, and/or fraudulent conduct on the part of Plaintiffs were none existed in fact, resulting in special economic damages to Plaintiffs, including but not limited to loss of the value of Plaintiffs' overall business reputation, lost business opportunities, and additional direct and/or indirect costs.

60.     A reasonably prudent person would or should have anticipated that economic damages would naturally flow to Plaintiffs as a consequence of Mayo's defamatory statements described herein.

61.     As a direct and proximate consequence of Mayo's intentional, unlawful, and malicious acts, Plaintiffs have suffered, and continue to suffer, monetary and non-monetary damages, including but not limited, mental and physical pain and suffering, emotional distress, harm to their personal and professional reputations, lasting embarrassment, humiliation, anguish, contempt, ridicule, damage to Plaintiffs' good name and reputation, and the loss of income, future income, and other direct and indirect costs. Plaintiffs have been injured, and continue to be injured, in an amount to be determined at trial, but in no event, less than Ten Million Dollars ($10,000,000).

## THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty)

62.     Plaintiffs repeat and reallege the allegations made in Paragraphs 1 through 61 hereof as though fully set forth herein.

63.     Mayo, in his capacity of EMOR's Chief Financial Officer, owed EMOR and its stockholders fiduciary duties, including the duties of loyalty, care, and candor.

64.     Pursuant to his fiduciary duty of loyalty, Mayo was, at all times, required to act in furtherance of the best interests of EMOR so as to benefit all of its stockholders equally and not in furtherance of his own personal interest or benefit.

65.     Mayo breached his fiduciary duty of loyalty by, *inter alia*:

(a)     making unauthorized withdrawals of cash from EMOR's bank accounts and misappropriating those funds for his personal use, unrelated to EMOR's business;

(b)     misappropriating funds provided to EMOR by purported investors in the company; and

(c)   misappropriating the cash from one of EMOR's bank accounts simultaneously with his closing of that account.

66.   As a direct result of Mayo's breaches of fiduciary duty of loyalty, EMOR has suffered damages in an amount to be determined at trial, but believed to be in excess of $100,000.00, plus interest.

### FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

67.   Plaintiffs repeat and reallege the allegations made in Paragraphs 1 through 66 hereof as though fully set forth herein.

68.   At Mayo's request, EMOR provided Mayo with access to EMOR's bank accounts at a time when Mayo was EMOR's Chief Financial Officer. EMOR reasonably understood that Mayo wanted access to EMOR's bank accounts in connection with performing his duties as the company's CFO. Mayo, however, withdrew funds from one or more of EMOR's bank accounts for purposes unrelated to EMOR's business and for Mayo's personal use. In addition, on at least one occasion, Mayo closed an EMOR bank account and misappropriated all of the funds in the account for his own personal use.

69.   On yet another occasion, Mayo, who was living in Florida, had EMOR send him plane fare in connection with an upcoming meeting in New York with the company's Board of Directors. Mayo, however, never attended the meeting and never returned the airfare the company advanced to him.

70.   It is against equity and good conscience to permit Mayo to retain the funds he misappropriated from EMOR's bank accounts and the funds he was provided for a plane ticket but never used to buy a ticket.

71.     As a direct result of Mayo's conduct, he has been unjustly enriched, to EMOR's detriment, in an amount to be determined atrial, but believed to be in excess of $100,000.00.

## FIFTH CAUSE OF ACTION

### (Permanent Injunction)

72.     Plaintiffs repeat and reallage the allegations contained in Paragraphs 1 through 71 hereof as if fully set forth herein.

73.     An injunction is necessary to enjoin Defendants from publishing statements similar and/or relating to the defamatory statements referenced herein and/or any additional and similar statements concerning Ian Parker and/or the businesses in which he is affiliated, including, but not limited to EMOE, and their reputations, business and/or trade, including, but not limited to, an injunction enjoining specific allegations that "EMOR is a sham" corporation" and that "Parker stole $1,000,000" when in fact those statements are false..

74.     Plaintiffs will sustain immediate and ongoing and substantial and irreparable injury if Mayo, and any and all individuals and/or agents not yet named but working on Mayo's behalf, are not immediately ordered to stop their wrongful and tortious conduct and are not forced to stop disseminating false allegations concerning Plaintiffs and/or Plaintiffs' reputation, business, and/or trade.

75.     Plaintiffs are likely to succeed on the merits because it is clear that Defendants' actions constituted defamation, including defamation per se; that the defamatory statements were made maliciously while knowing that the Plaintiffs had complied with all laws, rules and regulations.

76. The defamatory statements falsely charge Plaintiffs with wrongful and/or criminal misconduct, including a claim which would indicate that Parker committed a felony under the New York State Penal Code.

77. Mayo's defamatory statements are not protected speech, but merely an instrument of and incidental to wrongful conduct calculated to injure Plaintiffs and to interfere with Plaintiffs' business and/or trade unless they succumbed to Mayo's extortionate threats.

78. Unless Mayo is restrained by a permanent injunction from continuing his wrongful and unjustified conduct, Plaintiffs will continue to suffer severe, irreparable harm..

79. Plaintiffs have no adequate remedy at law because monetary damages will not afford adequate relief for the risk of irreparable injury which Mayo's continued course of misconduct will cause.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Defendant Joseph Mayo as follows:

(a) On the First Cause of Action, awarding Plaintiffs EMOR and Parker monetary damages in an amount to be determined at trial, but believed to be at least Ten Million Dollars ("10,000,000.00"), plus interest at the highest rate allowable by law;

(b) On the Second Cause of Action, awarding Plaintiffs EMOR and Parker monetary damages in an amount to be determined at trial, but believed to be at least Ten Million Dollars ("10,000,000.00"), plus interest at the highest rate allowable by law;

(c) On the Third Cause of Action, awarding Plaintiff EMOR monetary damages in an amount to be determined at trial, but believed to be at One Hundred Thousand Dollars ("100,000.00"), plus interest at the highest rate allowable by law;

(d) On the Fourth Cause of Action, awarding Plaintiff EMOR monetary damages in an amount to be determined at trial, but believed to be at One Hundred Thousand Dollars ("100,000.00"), plus interest at the highest rate allowable by law;

(e) On the Fifth Cause of Action:

i.   permanently enjoining Mayo from contacting anyone concerning Plaintiffs' activities with regard to Plaintiffs' reputation, business and /or trade, including but not limited to issuing statements on their website or blogs;

ii.   permanently enjoining Mayo from falsely alleging that Plaintiffs and or any related entities are engaging or have engaged in any wrongful and/or fraudulent activities;

iii.   permanently enjoining Mayo from making any written or verbal statement (including a statement made in any electronic form, on the internet, message boards, blogs, social media or otherwise recorded or communicated in any manner) concerning Plaintiffs which (1) imputes to a person in his profession, trade or business any kind of incompetence, fraud, dishonesty, misconduct, incapacity, or unfitness; or (2) which would cause a reasonable person to alter their opinion of the subject of the statement in a negative way, taking the statements in the context in which they appear; and

iv.   ordering Mayo to issue a written statement approved by Plaintiffs to all recipients of defamatory statements as well as to all unknown recipients by way of the press and through his email, website and/or related blogs stating that these statements were false and wrongfully and/or maliciously made with the intent to, among other things, cause damage to Plaintiffs' reputation and to cause a reasonable person to view Plaintiffs in a negative manner and/or destroy or impair the business relationships of Plaintiffs;

(f)   awarding Plaintiffs their attorneys' fees, costs and disbursements of this action; and

(g)   awarding Plaintiffs such other and further relief as the Court deems just and proper.

## VI.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: Garden City, New York
July 30, 2020

Respectfully submitted,

**MORITT HOCK & HAMROFF LLP**

By: _____
Alexander D. Widell
400 Garden City Plaza
Garden City, New York 11530
(516) 873-2000

*Attorneys for Plaintiffs*

2257244v4